FILED
United States Court of Appeals
Tenth Circuit

September 1, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 07-4193

MICHAEL ALBERT,

Defendant - Appellant.

**Appeal from the United States District Court
for the District of Utah
(D.Ct. No. 2:06-CR-00761-DS)**

Submitted on the Briefs:

Stephen J. Sorenson, Assistant United States Attorney (Brett L. Tolman, United States Attorney, with him on the briefs), Salt Lake City, Utah, for Plaintiff-Appellee.

Scott Keith Wilson, Assistant Federal Public Defender (Steven B. Killpack, Federal Public Defender, with him on the briefs) for Defendant-Appellant.

Before **KELLY**, **EBEL**, and **O'BRIEN**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

Michael Albert was convicted of being a felon in possession of a firearm

following the discovery of a shotgun and shells (later determined to be his) during

a search of the vehicle in which he was traveling. He moved to suppress the weapon and ammunition as well as statements he made to police, arguing he was illegally arrested and the evidence was the fruit of a constitutional violation. The district court denied his motion. We affirm.

## I. BACKGROUND

At approximately 1:30 p.m. on August 22, 2006, Sandy City Police Officer Amy DeNeff conducted a traffic stop of a white Oldsmobile Alero after observing it make an illegal lane change. DeNeff approached the vehicle when it came to a stop and asked the driver, Rachel Sermon, for her license, registration and proof of insurance. Sermon provided a temporary registration but stated she did not have identification and the vehicle was not insured because it had been recently purchased and she was still shopping around for insurance. DeNeff also requested identification from the passenger, Michael Albert, whom she observed was not wearing a seatbelt. Albert produced a temporary Utah identification card. DeNeff asked Sermon and Albert to wait in the vehicle while she verified their information.

Through her initial computer check, DeNeff located two outstanding warrants for Sermon. She also discovered both Sermon and Albert's driver's licenses had been suspended. After the arrival of two back-up officers, Sermon was arrested because of the outstanding warrants and placed in the backseat of a patrol car. Albert was asked to step out of the vehicle and stand next to one of

-2-

the back-up officers, away from the Oldsmobile, while DeNeff searched the vehicle's interior incident to Sermon's arrest.

After approximately five to ten minutes of searching, Officer DeNeff located a black gym bag in the back passenger seat which contained a crystalline substance, later determined to be methamphetamine, along with a scale, a marijuana pipe and multiple syringes.[1] Following the discovery of the drugs, DeNeff radioed to Brent Webb, one of the back-up officers, and requested he place Albert into custody. Webb handcuffed Albert and searched his person, discovering a rubber tourniquet in his front pocket.

At that point, DeNeff began to inventory the vehicle's contents in preparation for it to be impounded pursuant to Sandy City Police Department policy. She made the decision to impound the vehicle prior to the discovery of the methamphetamine because the vehicle was located on private property and the owners of the business on the property requested it be removed. At the suppression hearing, DeNeff testified she did not consider turning the car over to Albert because his license had been suspended and the car was not insured. She could not recall who owned the Oldsmobile, though she was "sure [she] knew" at the time. (R. Vol. II at 23.)

During the inventory of the trunk, DeNeff discovered a shotgun wrapped in

---

[1] Officer DeNeff testified at the suppression hearing that the methamphetamine was a user quantity.

a blanket. The blanket was tied by a sock with seven shotgun shells inside. After discovering the weapon, she ran a criminal history check on both Sermon and Albert to determine whether either was restricted from possessing a weapon. The criminal history check indicated Albert was a convicted felon. At that point, approximately twenty minutes after he was handcuffed, DeNeff advised Albert of his *Miranda*[2] rights. He waived his rights and, in response to questioning, admitted he knew the shotgun was in the trunk. He explained the shotgun belonged to his mother's boyfriend and he was merely transporting it for him. He knew he could not shoot firearms, but believed he could possess them. In separate questioning, Sermon admitted to possessing the drugs.

Sermon was arrested for possessing the drugs and Albert was arrested for possessing the shotgun and drug paraphernalia found on his person. Sermon and Albert were transported to the police station where they were interviewed by Sergeant Troy Arnold after again being advised of their *Miranda* rights. During his interview, Albert again admitted to possessing the shotgun. Sermon initially claimed the shotgun was hers, but recanted when she was told Albert admitted it belonged to him.

Albert was charged by indictment with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).[3] He filed a motion

___

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[3] Albert was indicted under the name "Grady Dean Brasher." In February 1998, Albert legally changed his name from Grady Dean Brasher to Michael Subastien Albert.

to suppress the shotgun and shells seized from the car and the statements he made to police arguing: (1) the evidence and statements were the "fruit of an illegal arrest;" and (2) his *Miranda* waiver was "not knowing and voluntary." (R. Vol. I, Doc. 18 at 2.) The court held a suppression hearing, at which Officer DeNeff, Officer Arnold, and Albert testified. Albert's testimony was limited to his mental and physical state at the time of his arrest.[4] Following the suppression hearing, Albert and the government submitted briefs in support of their respective positions. Albert conceded his *Miranda* argument, leaving only the alleged Fourth Amendment violation.

The district court denied Albert's motion, concluding the officers' detention of Albert following the discovery of methamphetamine in the vehicle was reasonable under *Terry v. Ohio*, 392 U.S. 1 (1968), and the use of handcuffs did not transform the detention into an illegal arrest. The court reasoned the officers were entitled to preserve the status quo and take reasonable steps to ensure their safety. The court did not specifically address the search of Albert's person. Because the court determined Albert was not illegally arrested, it did not consider whether the evidence seized from the vehicle and the statements he made to the police should be suppressed for that reason.

Following the denial of his motion to suppress, Albert filed a written

---

[4] Albert testified he had taken methamphetamine approximately one hour before the traffic stop and was thus impaired during the stop and the subsequent questioning.

stipulation admitting the facts necessary for a conviction but preserving his right to appeal. The court found Albert guilty after a bench trial and sentenced him to 94 months imprisonment, just below the advisory guideline range. Albert filed a timely notice of appeal.

Albert maintains the officers' handcuffing and searching him amounted to an illegal arrest.[5] The government contends the district court correctly concluded Albert was detained, not arrested, prior to the discovery of the shotgun and ammunition and his incriminating statements. The government also argues that,

---

[5] Albert does not challenge Officer DeNeff's search of the vehicle's passenger compartment incident to Sermon's arrest. In *Arizona v. Gant*, the Supreme Court held a search of a vehicle's passenger compartment incident to the arrest of a recent occupant is only lawful "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." – U.S. –, 129 S. Ct. 1710, 1719 (2009) (quotations omitted). It appears neither of those circumstances are present here but the propriety of the search is not presented for our review. In any event, we recently held "it would be proper for this court to apply the good-faith exception [to the exclusionary rule] to a search justified under the settled case law of a United States Court of Appeals, but later rendered unconstitutional by a Supreme Court decision." *United States v. McCane*, No. 08-6235, 2009 WL 2231658, at *6 (10th Cir. July 28, 2009) (discussing effect of *Gant*). Albert concedes "[t]he effect of *McCane* is . . . that searches conducted prior to the decision in *Gant* are analyzed under the pre-*Gant* 'settled case law' of this Circuit, since this Court will uphold the validity of a search incident to arrest conducted in good-faith reliance on those standards." (Appellant's Resp. to Gov't Mot. for Leave to File a Supp. Br. at 4.)

Moreover, it appears Albert lacks standing to challenge the search of the vehicle. "[I]n order for a defendant to show [a subjective expectation of privacy in an automobile which society is prepared to recognize as objectively reasonable], the defendant bears the burden at the suppression hearing to show a legitimate interest in or a lawful control over the car." *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009). No evidence suggested Albert had ownership or possessory rights to the vehicle.

regardless of whether Albert was lawfully detained or illegally arrested, the shotgun and ammunition should not be suppressed because: (1) they were discovered in the trunk, which the officers had probable cause to search following the discovery of drugs in the passenger compartment; and (2) they were discovered pursuant to a valid inventory search. Albert contends we should not consider whether the discovery of the methamphetamine provided the police with probable cause to search the trunk because the government raises this issue for the first time on appeal. As for the inventory search, Albert argues it cannot provide a basis for denying his motion to suppress because DeNeff lacked justification for impounding the vehicle.

## II. DISCUSSION

"In reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous. The ultimate determination of reasonableness under the Fourth Amendment is a question of law, which we review de novo." *United States v. Contreras*, 506 F.3d 1031, 1035 (10th Cir. 2007) (citation omitted).

A.    Fourth Amendment Analysis

In *Terry v. Ohio*, the Supreme Court held a police officer can temporarily detain an individual suspected of criminal activity if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21. "Since police

officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop.'" *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). "An encounter between police and an individual which goes beyond the limits of a *Terry* stop, however, may be constitutionally justified only by probable cause or consent." *Id.*

The government does not contend the officers had probable cause to arrest Albert following the discovery of the drugs. Instead, it argues the detention was not an arrest and thus, need not have been supported by probable cause. The question presented on appeal is whether the handcuffing of Albert, search of his person and subsequent detention were permissible under *Terry*. "There is no bright-line rule to determine whether the scope of police conduct was reasonably related to the goals of the stop; rather our evaluation is guided by common sense and ordinary human experience." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (quotations omitted). We avoid "unrealistic second-guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only reasonable ones." *Id.* (quotations omitted). "In measuring the actions of a police officer under the Fourth Amendment . . . we look at the objective facts, not the officer's

state of mind." *United States v. Neff*, 300 F.3d 1217, 1222 (10th Cir. 2002). The government has the burden of demonstrating the officers' conduct satisfies *Terry*. *See Perdue*, 8 F.3d at 1462.

*1. Use of Handcuffs*

"[A] *Terry* stop does not become unreasonable just because police officers use handcuffs on a subject . . . ." *Neff*, 300 F.3d at 1220. However, the use of handcuffs is greater than a de minimus intrusion and thus "requires the government to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Melendez-Garcia*, 28 F.3d at 1052 (quotations omitted).

The facts available to the officers here satisfy that test. Even at the early stages of the stop, Officer DeNeff had reason for caution—she encountered a driver with a suspended driver's license and two outstanding warrants—driving an uninsured vehicle and accompanied by an unlicensed adult passenger.[6] In *United States v. Holt*, we recognized:

> An officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped. Every traffic stop, after all, is a confrontation. The motorist must suspend his or her plans and anticipates receiving a fine and perhaps even a jail term. That expectation becomes even more real when the motorist or a passenger knows there are outstanding arrest warrants or current

---

[6] The situation was even more dangerous than Officer DeNeff was aware, as Albert had used methamphetamine approximately one hour prior to the traffic stop. However, the fact there were two additional officers on-scene reduced somewhat the potential danger faced by DeNeff.

> criminal activity that may be discovered during the course of the
> stop.

264 F.3d 1215, 1223 (10th Cir. 2001) (en banc); *see also Maryland v. Wilson*, 519

U.S. 408, 413 (1997) ("[T]he fact that there is more than one occupant of the

vehicle increases the possible sources of harm to the officer.").

After arresting Sermon (but before Albert was handcuffed), DeNeff

discovered evidence of a new crime—drug possession—further elevating the

danger of the encounter. *See United States v. Garcia*, 459 F.3d 1059, 1064 (10th

Cir. 2006) ("[A] connection with drug transactions can support a reasonable

suspicion that a suspect is armed and dangerous."); *United States v. Johnson*, 364

F.3d 1185, 1194-95 (10th Cir. 2004) (recognizing drug dealing is a crime

"typically associated with some sort of weapon, often guns"); *United States v.*

*Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and

violence are frequently associated with drug transactions, it is reasonable for an

officer to believe a person may be armed and dangerous when the person is

suspected of being involved in a drug transaction").  Despite being justifiably

cautious, the officers did not draw their weapons, force Albert to the ground or

employ restraints other than the handcuffs.

Though we have not confronted a materially indistinguishable case, we

have approved the use of handcuffs in the context of a *Terry* stop.  *See Neff*, 300

F.3d at 1221 (use of handcuffs during a brief investigative detention reasonable

-10-

where the police encountered a suspect believed to be carrying a dangerous concealable weapon); *Perdue*, 8 F.3d at 1463 (use of firearms and handcuffs reasonable where police encountered a suspect believed to be armed and dangerous); *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993) (use of firearms and handcuffs reasonable where police encountered a suspect who had threatened to kill someone and was acting violently); *United States v. Merritt*, 695 F.2d 1263, 1274 (10th Cir. 1982) (use of firearms and handcuffs reasonable where police encountered a murder suspect believed to be heavily armed accompanied by others who could possibly lend support).

Albert relies on *Melendez-Garcia*, but that case is inapposite. In *Melendez-Garcia*, the police conducted a "felony stop" of two vehicles believed to be transporting drugs.

> The officers pulled out their weapons and trained them on the vehicles. The occupants were told to throw their keys out the window and put their hands out. They were then told to exit the vehicles one at a time and walk backwards towards the officers. The officers then handcuffed and frisked them. The three were placed in separate vehicles and strapped in with seatbelts.

28 F.3d at 1050. We held "the government ha[d] not met its burden of showing that, under the totality of the circumstances, the intrusiveness of this seizure was reasonably necessary for officer safety." *Id.* at 1053. Significantly, "the government [did] not try to elaborate why it believe[d] the quantum of force used to secure [the three individuals] was reasonable." *Id.* at 1052. The district court

-11-

distinguished *Melendez-Garcia* on the basis that "no guns were brandished [against Albert] and the presence of drugs in the vehicle [here] was confirmed, not just suspected . . . ."  (R. Vol. I, Doc. 31 at 8.)

We agree with the government and the district court—the use of handcuffs was reasonable under these circumstances, coming as it did after the discovery of a controlled substance (and with knowledge of two outstanding warrants for the unlicensed driver).  The use of handcuffs did not elevate this detention into an arrest.

*2.  Search of Albert's Person*

The next question is whether the search of Albert's person was reasonable under the circumstances.  The district court did not evaluate the reasonableness of the search.[7]  "During an investigative detention, police officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo.  In some circumstances, these safety measures may include a pat-down search for weapons."  *Garcia*, 459 F.3d at 1063; *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, he may conduct a limited protective search for concealed weapons.") (quotations omitted).

---

[7] The court did note Officer DeNeff's characterization of the search as a search incident to Albert's arrest was not determinative on the question of whether Albert was arrested.

"[A]n individual's known connection with drug transactions is a factor supporting reasonable suspicion to frisk that individual for weapons." *Garcia*, 459 F.3d at 1065; *see, e.g.*, *Johnson*, 364 F.3d at 1194-95 (concluding a frisk was permissible "[b]ecause [the officer] reasonably suspected that Johnson might be involved in drug dealing, kidnapping, or prostitution," which are crimes "typically associated with some sort of weapon, often guns"); *United States v. $109,179 in United States Currency*, 228 F.3d 1080, 1086 (9th Cir. 2000) (finding a frisk justified and asserting "[b]ecause the police reasonably suspected [the defendant] of dealing in narcotics, it was not unreasonable to believe that he might be armed").

However, even in the context of a known drug transaction, a *Terry* frisk is only valid if it is confined to a search for weapons because "[t]he purpose of the limited pat-down search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." *Garcia*, 459 F.3d at 1063 (quotations omitted); *see, e.g., Johnson*, 364 F.3d at 1195 (holding an officer's pat down search was permissible where he "confined his search strictly to what was minimally necessary to ensure Johnson was not armed," and "did not threaten Johnson in any way, use force, or handcuff him") (quotations omitted). Where, in the context of a limited pat-down, an officer continues to explore a defendant's pocket after concluding it does not contain a weapon, the search "amount[s] to the sort of evidentiary search that *Terry* expressly refused to

-13-

authorize and that [the Supreme Court] ha[s] condemned in subsequent cases."

*Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) (citation omitted).

In *United States v. Harris*, we rejected the defendant's argument that he

was subjected to an overly intrusive frisk. 313 F.3d 1228, 1233 (10th Cir. 2002).

In that case:

> [The officer] felt a hard object, approximately three inches wide by four to five inches long, in the inner part of Defendant's left cowboy boot. Thinking that the object might be a gun, [the officer] lifted up Defendant's pant leg and saw a tightly wrapped Saran Wrap package in the boot. Still unsure of what the object was, [the officer] reached inside Defendant's boot to retrieve it. At that point, Defendant kicked [the officer] in the shoulder and started to run. [The officer] was left holding the Saran Wrap package, which was later found to contain cocaine base, or "crack" cocaine.

*Id.* at 1232.

We held: "If the officer discovers what he believes to be a weapon, he may

reach inside the suspect's clothing and remove it." *Id.* We noted the officer

testified he thought the bulge in the defendant's boot "might be a gun" and, even

after lifting the defendant's pantleg "he was still not sure exactly what the object

was" and "never testified that he ruled out that the object was a weapon." *Id.* We

explained: "Even if, in retrospect, it would have been more reasonable to think

the hard object was drugs rather than a gun, that does not mean he would have

been unreasonable to conclude that it was a gun and not drugs." *Id.* (quotations

omitted).

Here, the officer who searched Albert did not testify at the suppression

-14-

hearing. But he must have reasonably believed the tourniquet was a weapon in order for its seizure or a further search to be permissible.[8] Unlike in *Harris*, the record here contains no basis for us to conclude the officer strictly confined his search to what was minimally necessary to ensure Albert was not armed. While the pat-down was reasonable at its inception, it became an impermissible frisk when the tourniquet was seized.[9] But that alone (or in combination with the handcuffing) does not transform the detention into an illegal arrest.

### 3. Continued Detention Following Discovery of Drugs

Albert was detained for a period of approximately twenty minutes and ultimately subjected to an overly-broad frisk. But the detention was not the product of the frisk. It came as a result of DeNeff's decision to impound the vehicle and conduct an inventory search. "Investigative detentions . . . are reasonable if they are supported by a reasonable suspicion that the detained individual is engaged in criminal activity." *Novitsky v. City of Aurora*, 491 F.3d 1244, 1253 (10th Cir. 2007). These officers had good reason to detain Albert pending further investigation.

---

[8] The government does not contend the officer had probable cause to search Albert once it felt the tourniquet in his pocket.

[9] The tourniquet and any other evidence subsequently found on Albert's person could be subject to suppression. Albert was not charged with illegal possession of the tourniquet and, while it is unclear whether the government tried to offer the tourniquet (or other evidence obtained from Albert's person), Albert did not seek to suppress such items.

The officers knew Albert had a suspended driver's license and was a passenger in an uninsured vehicle which was being driven by an unlicensed driver with two outstanding warrants. They detained him after discovering a gym bag in the backseat of the vehicle which contained methamphetamine. Under both federal and Utah law, it is a crime to possess methamphetamine. 21 U.S.C. § 844(a); Utah Stat. Ann. § 58-37-8(2)(a)(i). The officers did not have probable cause to believe Albert was guilty of possessing a controlled substance because they did not know whether the gym bag belonged to Albert, Sermon or someone else; it was unclear who owned the vehicle.[10] They did, however, have reasonable suspicion, "a lesser standard than probable cause." *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1233 (10th Cir. 2009). "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). "[A]s long as [the officer] has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality." *Johnson*, 364 F.3d at 1194. All reasonable suspicion requires is "some minimal level of objective justification." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quotations omitted). The officers had reason to suspect Albert had some

---

[10] DeNeff testified she was "sure [she] knew [who the owner was] at the time" of the incident, but could not recall the name during the suppression hearing. *Supra* at 4; (R. Vol II at 23).

connection with the illegal drugs and it was not unreasonable for them to detain

him until they could sort out the details.

B.      Suppression of the Shotgun and Shells and the Statements Albert Made to
        the Police

Because Albert was not illegally arrested, there is no basis for suppressing

the shotgun and shells seized from the vehicle or the statements he made to the

police.  But even if he had been illegally arrested, he is not entitled to relief.  Any

evidence obtained subsequent to his arrest should have been suppressed as "fruit

of the poisonous tree," but only if he established "a factual nexus between the

illegality and the challenged evidence."  *United States v. Nava-Ramirez*, 210 F.3d

1128, 1131 (10th Cir. 2000) (quotations omitted).  "At a minimum, a defendant

must adduce evidence at the suppression hearing showing the evidence sought to

be suppressed would not have come to light but for the government's

unconstitutional conduct."[11]  *Id.*  If the defendant meets this burden, the

government must prove the "evidence sought to be suppressed is not 'fruit of the

poisonous tree,' either by demonstrating the evidence would have been inevitably

---

[11] We have "recognize[d] that this requirement has been criticized as forcing the
defendant essentially to disprove that the evidence would have been inevitably
discovered, contrary to the general rule that the government bears the burden of proving
that unconstitutionally obtained evidence is nonetheless admissible under the inevitable
discovery doctrine."  *United States v. Ladeaux*, 454 F.3d 1107, 1111 n.4 (10th Cir. 2006).
"However meritorious these criticisms may be, we are bound by the precedent of prior
panels absent en banc reconsideration or a superseding contrary decision by the Supreme
Court."  *Id.* (quotations omitted).

discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."[12]  *Id.*

Albert adduced no evidence at the suppression hearing showing his being detained, handcuffed or frisked was the "but for" cause of DeNeff's discovery of the shotgun and shells.  In fact, the record demonstrates DeNeff planned to impound the vehicle and conduct an inventory search even before Albert was handcuffed or frisked.  The inventory search, not Albert's detention or the search of his person, led to the discovery of the shotgun and shells.  And it appears the inventory search and criminal history check revealing Albert to be a convicted felon were the "but for" cause of Albert's incriminating statements.

We **AFFIRM** the district court's denial of Albert's motion to suppress.  We **DENY** as moot the government's opposed motion for leave to file a supplemental brief relating to *Arizona v. Gant,* – U.S. –, 129 S. Ct. 1710 (2009), and *United States v. McCane*, No. 08-6235, 2009 WL 2231658 (10th Cir. July 28, 2009).

---

[12] This Court has applied this test to a defendant's statements as well as physical evidence.  *See United States v. Torres-Castro*, 470 F.3d 992, 999-1000 (10th Cir. 2006).